# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**HK SYSTEMS, INC.,**
       **Plaintiff,**

     v.                                      **Case No. 02C1103**

**EATON CORPORATION,**
       **Defendant.**

## DECISION AND ORDER

Plaintiff HK Systems, Inc. ("HK") brings this diversity action against defendant Eaton Corporation ("Eaton"), alleging that Eaton breached a contractual obligation to defend, indemnify and hold it harmless for certain liabilities. On February 9, 2006, I granted plaintiff's motion for partial summary judgment on the issue of liability, and Eaton now asks me to reconsider my decision or, alternatively, to certify certain issues for immediate interlocutory appeal.

## I. FACTS AND BACKGROUND

In August 1994, Eaton-Kenway, Inc. ("Eaton-Kenway"), a subsidiary of Eaton, responded to a request for a proposal from Iowa Beef Producers, Inc. ("IBP") to construct an automated material handling system ("AMHS") for its beef processing plant in Dakota City, Nebraska. Eaton-Kenway and IBP entered into negotiations and, in December 1994, IBP advised Eaton-Kenway by letter that it would purchase an AMHS from Eaton-Kenway. IBP and Eaton-Kenway continued to negotiate the AMHS's design and its "throughput" ability, i.e., its capacity to move cartons of beef in a given period of time. On January 11,

1995, R. K. Long of Eaton-Kenway represented to IBP in a letter that the AMHS would "meet or exceed" IBP's expectations with respect to throughput.

While Eaton-Kenway and IBP negotiated concerning the design of the AMHS, Harnischfeger Engineers, Inc. ("Harnischfeger"), which previously competed with Eaton-Kenway, entered into negotiations with Eaton and Eaton-Kenway concerning purchasing some of Eaton-Kenway's assets. On January 12, 1995, Eaton, Eaton-Kenway and Harnischfeger entered into an Asset Purchase Agreement ("Agreement") pursuant to which Harnischfeger purchased Eaton-Kenway's rights in connection with certain projects including the IBP Dakota City project. In February 1995, the parties completed the transaction, and Harnischfeger changed its name to HK Systems, Inc.

In Article 10.1 of the Agreement, Eaton and Eaton-Kenway agreed as follows:

> <u>Indemnification of the Buyer</u>. Each of the Seller [i.e., Eaton-Kenway] and Eaton, jointly and severally shall indemnify the Buyer . . . and hold [it] harmless from and against any and all damages, losses, deficiencies, actions, demands, judgments, costs and expenses (including attorneys' and accountants' fees) of or against [the Buyer] resulting from . . . (iii) any act or omission of the Seller or Eaton or any occurrence of a matter with respect to the Subject Assets or the Subject Business relating to or arising out of the period on or before the Closing Date, including without limitation, any claim related to any work performed by the Seller under . . . any of the . . . Projects.

On March 23, 1995, HK entered into a contract with IBP pursuant to which it, and its subcontractor, Alvey, Inc., manufactured and installed the AMHS for the Dakota City project. Subsequently, IBP sued HK alleging that the AMHS had failed to satisfy its expectations. IBP asserted claims of: (1) breach of contract; (2) breach of express warranty; (3) breach of implied warranty of fitness; (4) breach of implied warranty of

2

merchantability; (5) negligent misrepresentation; (6) fraud in the inducement; and (7) violation of the Nebraska Uniform Deceptive Trade Practices Act ("UDTPA").

Believing that IBP's claims arose at least in part out of Eaton-Kenway's representations concerning the AMHS, including the Long letter, HK asked Eaton to defend, indemnify and hold it harmless pursuant to Article 10.1 of the Agreement.[1] When Eaton refused, HK defended IBP's suit. It obtained summary judgment on IBP's fraud in the inducement claim and an order excluding Eaton-Kenway's statements made prior to HK's entering into the IBP contract. HK ultimately settled IBP's suit, after which it asked Eaton to indemnify it for a portion of its settlement and defense costs. Eaton refused, and HK commenced the present action.[2]

On December 17, 2003, I construed Article 10.1 of the Agreement on which HK based its suit and found the "[t]he unqualified language 'resulting from' contained in Article 10.1 encompasses indemnification for injuries that are either wholly or partially due to the seller's actions. The plain meaning of the cross indemnity provisions in Article 10.1 is that, if one party must indemnify the other party, it must do so to whatever extent covered losses resulted from its acts or omissions." (Mem. at 9, Dec. 17, 2003.) In my February 9 order, I concluded that the claims for which HK sought indemnification were within the scope of the indemnity agreement and that therefore Eaton was obliged to indemnify HK for losses

---

[1]The parties agree that Eaton has no duty to indemnify HK for losses resulting from the negligent misrepresentation claim.

[2]I will hereafter refer to Eaton and Eaton-Kenway as "Eaton."

relating to these claims.  See HK Sys., Inc. v. Eaton Corp., No. 02C1103, 2006 U.S. Dist. LEXIS 8448 (E.D. Wis. Feb. 9, 2006).

## II.  STANDARD OF REVIEW

My decision of February 9 did not terminate the action and therefore is "subject to revision at any time."  Fed. R. Civ. P. 54(b).  Nevertheless, under the law of the case doctrine, courts should be reluctant to reopen issues once decided.  Agostini v. Felton, 521 U.S. 203, 236 (1997).  However, if a court is convinced that it mistakenly decided a question it may revise its decision.  Id.; see also Akzo Coatings, Inc. v. Aigner Corp., 909 F. Supp. 1154, 1159 (N.D. Ind. 1995) (explaining that whether to reconsider an interlocutory order is within the sound discretion of the district court and that "[u]nlike motions to reconsider final judgments, which are governed by Federal Rules of Civil Procedure 59 or 60, a motion to reconsider an interlocutory order may be entertained and granted as justice requires") (citing Acme Printing Ink Co. v. Menard, Inc., 891 F. Supp. 1289, 1295 (E.D. Wis. 1995)).

## III. DISCUSSION

### A.    Reconsideration

In my February 9 decision, I incorrectly analyzed HK's indemnification claim.  In order to prevail on such claim, HK must establish that it suffered an injury that is indemnifiable under the Agreement.  S. Ry. Co. v. Ga. Kraft Co., 823 F.2d 478, 480-81 (11th Cir. 1987).  Even if an indemnitor refuses to defend an indemnitee, as Eaton refused to defend HK, the indemnitee must still show that its injury is covered by the

4

indemnification agreement.[3] In the present case, the Agreement requires Eaton to indemnify HK for losses wholly or partially "resulting from" Eaton's acts or omissions. The phrase, "resulting from," is synonymous with "arising out of," see Lee R. Russ & Thomas F. Segalia, 7 Couch on Insurance 3d § 101:54 (3d ed. 2005) (collecting cases), and

---

[3]This proposition is well settled. See Royal Ins. Co. of Am. v. Kirksville College of Osteopathic Med., Inc., 304 F.3d 804, 807 (8th Cir. 2002) (explaining that even when it has breached a duty to defend, an insurer is still entitled to a trial on the coverage issue); Henning v. Cont'l Cas. Co., 254 F.3d 1291, 1295 (11th Cir. 2001) (noting that an insurer is not estopped from asserting the defense of lack of coverage even if it wrongfully fails to defend); W. Alliance Ins. Co. v. N. Ins. Co. of New York, 176 F.3d 825, 831 (5th Cir. 1999) (holding that the facts in record established that underlying claim fell within the policy coverage after noting that the insurer cannot contest the insured's liability after settlement); Ill. Central Gulf R. Co. v. Int'l Paper Co., 889 F.2d 536, 540 (5th Cir. 1989) (explaining that in addition to proving it was potentially liable and the settlement was reasonable, plaintiff must show that the parties' indemnity agreement covered plaintiff's loss); Everett Assocs., Inc. v. Transcon. Ins. Co., 159 F. Supp. 2d 1196, 1209-10 (N.D. Cal. 2001) (noting that when the insured settles a claim, the question of whether liability of the insured was one which the contract of insurance covered remains open and may be litigated and determined in an action brought by the insured against the insurer to recover the amount paid in judgment based on improper refusal to defend); FabArc Steel Supply, Inc. v. Composite Constr. Sys. Inc., 914 So.2d 344 (Ala. 2005) (explaining that the "potential liability" concept is not an issue if the indemnity provisions were not triggered); Restatement (Second) of Judgments § 57 (1982) ("[t]o establish the indemnitor's obligation, two determinations of liability are involved. The first is that of the indemnitee to the injured party, a matter to be resolved by the law governing their relationship (e.g., the law of torts). The second is whether the loss in question is within the terms of the indemnity obligation assumed by the indemnitor"); Restatement (Second) of Judgments § 57, Illustration 2 (explaining that when an indemnitee reasonably settles a claim that the indemnitor has refused to defend, the indemnitor may not argue that the indemnitee did not face liability, but he may litigate whether the loss in question is within the terms of the indemnity obligation assumed by the indemnitor).
    In addition, unlike the duty to defend, the duty to indemnify is not triggered by the allegations in the complaint. Everson v. Lorenz, 280 Wis. 2d 1, 10-11 (2005). Indeed, requiring an indemnitor to indemnify an indemnitee based on the allegations on the face of the complaint would inappropriately "enlarge the bargained for coverage as a penalty for breach of the duty to defend." See Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford, 64 N.Y.2d 419, 445 (Ct. App. N.Y. 1985).
    Finally, because HK must establish that its losses are covered by the Agreement, the potential liability standard which I discussed in the February 9 decision has no application.

5

"arising out of" means "originating from, growing out of, or flowing from, and requir[es] only that there be some causal relationship between the injury and the risk for which coverage is provided." Lawver v. Boling, 71 Wis. 2d 408, 415 (1976). Thus, to prevail on its indemnification claim, HK must establish that Eaton's conduct wholly or partially caused its losses. To the extent I previously ruled otherwise, I amend the February 9 order.

Eaton makes several arguments as to why HK cannot establish that Eaton's conduct caused its losses. However, I reject Eaton's arguments and I conclude that a trial is necessary. First, Eaton contends that because some of IBP's claims against HK involved allegations of breach of contract and it did not contract with IBP, HK cannot require it to provide indemnification for losses relating to such claims. However, this argument fails because the fact that Eaton did not contract with IBP is not dispositive of whether its acts or omissions may have contributed to HK's losses. Eaton similarly argues that its conduct could not have caused HK to suffer losses in connection with IBP's UDTPA claim because IBP could not have stated an UDTPA claim against it. This argument also fails because whether IBP could have stated an UDTPA claim against Eaton is not determinative of whether Eaton may have contributed to HK's losses.

Second, Eaton argues that no reasonable factfinder could find that its acts or omissions contributed to HK's losses. However, HK presents evidence on which a reasonable factfinder could base such a finding. For example, Philip McCall declares "[t]he primary reason that IBP was dissatisfied with the AMHS was that, although HK and Alvey believe that the [AMHS] could have performed at the contract throughput rates had it been tested under appropriate conditions, the [AMHS] did not run as fast as the system IBP claims that Eaton had promised IBP when IBP had entered into the letter of intent in

6

December of 1994, and that R.K. Long had promised to provide in his letter of January 11, 1995." (Decl. of Philip S. McCall in Opp'n to Eaton's Corp.'s Mot. for Summ. J. ("McCall Decl.") ¶ 26.) Further, HK presents evidence that Eaton contributed to the design of the AMHS by rendering a three-dimensional graphic simulation of the system for IBP, (McCall Decl. Ex. C), designing critical components of the system, including the software operating it, and preparing a drawing of the AMHS as HK ultimately constructed it. (Stricker Dep. June 22, 2005 at 21-22, 25-26, 37-38.) Thus, there is a genuine issue of material fact as to whether Eaton's conduct contributed to HK's losses.

Third, Eaton argues that I mistakenly determined that judicial estoppel does not bar HK from attributing any of its losses to IBP's fraud in the inducement claim because HK prevailed on such claim and succeeded in excluding Eaton's representations regarding the AMHS's capability. The doctrine of judicial estoppel is designed to prevent a party that prevails in a lawsuit from repudiating the ground on which it prevailed in another lawsuit. Jarrard v. CDI Telecomm., Inc., 408 F.3d 905, 914 (7th Cir. 2005). The doctrine applies only when a party takes a position that is clearly inconsistent with a position it previously took, and it prevailed on its earlier position. Id. Further, the party must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped" and the operative facts must remain the same in both cases. Id. at 914-15.

As I stated in my February 9 decision, "HK's position in the present case, that it considered the possibility of IBP appealing the adverse decisions relating to the fraud in the inducement claim and Eaton's statements in deciding whether to settle, is consistent with the position taken in the IBP litigation, that it was not liable for such claim or such statements." HK Sys., Inc., 2006 U.S. Dist. LEXIS 8448, at *17. Eaton argues that under

7

Carnegie v. Household International, Inc., 376 F.3d 656 (7th Cir. 2004), it is irrelevant that IBP might have appealed. However, Carnegie holds only that after losing an appeal, a party is judicially estopped from asserting a position that is inconsistent with its original position. HK did not lose an appeal and, as stated, is not arguing inconsistent positions. Further, HK's conduct has not unfairly disadvantaged Eaton. Fairness is determined "in the context of the defendants' motive in changing positions," Jarrard, 408 F.3d at 915, and Eaton does not show that HK acted out of an improper motive. In the IBP litigation, HK had to defend allegations that Eaton misrepresented the capability of the AMHS, and it now contends that it is entitled to indemnification because it suffered losses resulting from Eaton's misrepresentation. This kind of shift, if it is a shift, is common in litigation, and I see nothing improper in it.

Finally, Eaton argues that no reasonable factfinder could conclude that its actions caused losses to HK which are attributable to IBP's fraud in the inducement claim. However, HK presents evidence indicating that IBP relied on Eaton's promises that the AMHS could meet or exceed the throughput rate of 3,197 cases per hour. (See McCall Decl. ¶ 26.) In a demand letter to HK, IBP's counsel stated that "Eaton, and hence HK, agreed very clearly in a letter dated January 11, 1995 to reaching the throughput requirements and evidenced their commitment to meet IBP's needs and requirements." (Decl. of Peter Richardson Ex. GG at 2.) Further, in the litigation with HK, IBP cited a list of Eaton's statements on which it relied in contracting with HK. IBP stated that Eaton assured it that the AMHS would meet the "functional requirements as defined in [IBP's] specifications," (id. Ex. EE at 2), and that in response to its repeated attempts to confirm that Eaton understood its requirements, R.K. Long "affirmatively represented that the

8

[AMHS] proposal would 'meet or exceed' the throughput requirements, and then included a chart of 'System Throughput Requirements' that does not reflect that the throughput rates are 'maximum rates.'" (Id.) Thus, the record contains evidence from which a reasonable jury could infer that HK suffered losses resulting from Eaton's actions in connection with the fraud in the inducement claim.

## B.  Interlocutory Appeal

Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal if it concludes that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." For a court to grant a § 1292(b) petition, "there must be a question of <u>law</u>, it must be <u>controlling</u>, it must be <u>contestable</u>, and its resolution must promise to <u>speed up</u> the litigation." <u>Ahrenholz v. Bd. of Trs. of Univ. of Ill.</u>, 219 F.3d 674, 675 (7th Cir. 2000). The party seeking interlocutory review has the burden of persuading the court that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment." <u>Fisons Ltd. v. United States</u>, 458 F.2d 1241, 1248 (7th Cir. 1972). In the § 1292(b) context, the Seventh Circuit defines the phrase "question of law" as:

> a question of the meaning of a statutory or constitutional provision, regulation or common law doctrine . . . . We also think . . . that the question of the meaning of a contract, though technically a question of law when there is no other evidence but the written contract itself, is not what the framers of section 1292(b) had in mind either . . . . We think they used 'question of law' in much the same way a lay person might, as referring to a 'pure' question of law rather than merely to an issue that might be free from a factual contest. The idea was that if a case turned on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record, the court should be enabled to do so without having to wait until the end of the case . . . . To summarize, district judges

9

should . . . . remember that 'question of law' means an abstract legal issue . . . .

Ahrenholz, 219 F.3d at 676-77.

Eaton requests that I certify the following questions for interlocutory appeal:

1. When an indemnitor exercises its contractual right to decline to defend a third-party claim and when the contract requires indemnification only after there is a determination that the losses resulted from the indemnitor's actions, should an indemnitee that settled a third-party claim be allowed to prevail on a contractual claim for indemnification by showing only that it was potentially liable to the third party based on the indemnitor's statements or conduct?

2. Should an indemnitee be relieved of its burden to prove liability when an indemnitor declined to prove a defense in underlying third-party litigation if the indemnitor had no duty to defend, and was not given the opportunity to approve a proposed settlement or take over the defense?

3. When an indemnitor has no duty to defend, should a duty to indemnify be imposed without proof that the indemnitor's acts caused the loss incurred by the indemnitee when it defended and settled a third-party claim?

4. Should a duty to indemnify be imposed for losses incurred by an indemnitee in settling a third-party claim alleging fraudulent inducement of a contract when the third party and the indemnitor were never in privity on the contract alleged to be fraudulently induced?

5. Should a duty to indemnify be imposed for losses incurred by an indmenitee in settling a third-party claim alleging breach of contract when the third party and the indemnitor were never in privity on that contract?

6. Should a duty to indemnify be imposed for losses incurred by an indemnitee in settling a third-party claim alleging a violation of the Uniform Deceptive Trade Practices Act when there was no possibility of a future violation of the UDTPA by the indemnitor?

7. Should HK be judicially estopped from arguing that its losses were caused by Eaton and/or Eaton-Kenway's pre-closing acts when HK successfully argued in the prior IBP litigation that IBP did not rely on any pre-closing representations of Eaton or Eaton-Kenway?

8. Does an indemnitor have the opportunity to "take over the defense" of a third-party claim when the indemnitee refuses to cede control

10

Case 2:02-cv-01103-LA    Filed 05/24/06    Page 10 of 12    Document 147

of the litigation and insists it would retain authority to direct the decision-making in the litigation?

(Def. Eaton Corp.'s Mem. of Law in Support of its M. to Reconsider at 13-14.)

In light of my decision on Eaton's motion to reconsider, I conclude that questions (1), (2), (3), and (8) are moot. I will also deny defendant's application with respect to questions (4), (5), and (6) because they involve interpretation of the Agreement and therefore are not "controlling questions of law" as the Seventh Circuit defines the phrase. See Ahrenholz, 219 F.3d at 676 (stating that "the question of the meaning of a contract . . . is not what the framers of section 1292(b) had in mind"). Finally, with respect to question (7) concerning judicial estoppel, a district court should not certify an order for interlocutory appeal unless it believes that the order presents a question "as to which there is a substantial ground for difference of opinion." 28 U.S.C. § 1292(b). To satisfy this requirement, it is not enough that there be a difference of opinion, there must be a substantial ground for such difference. As indicated in my discussion of the issue, I conclude that there is not a substantial ground for difference of opinion on this issue and will accordingly decline certification.

11

Case 2:02-cv-01103-LA   Filed 05/24/06   Page 11 of 12   Document 147

## IV.  CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Eaton's Motion to Reconsider is **GRANTED** as indicated above.

**IT IS FURTHER ORDERED** that Eaton's Motion for Interlocutory Appeal is **DENIED**.

Dated at Milwaukee, Wisconsin this 24 day of May, 2006.

/s_____
LYNN ADELMAN
District Judge

12