# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**HK SYSTEMS, INC.,**
               **Plaintiff,**

      **v.**                                **Case No. 02-C-1103**

**EATON CORPORATION,**
               **Defendant.**

---

## DECISION AND ORDER

Plaintiff HK Systems, Inc. ("HK") brought this diversity action against defendant Eaton Corporation ("Eaton"), alleging that Eaton breached a contractual duty to indemnify. After addressing a number of motions, I conducted a jury trial and the jury found for HK. Before me now are Eaton's motions for reconsideration of my decision denying its summary judgment motion and for judgment as a matter of law.[1]

## I. INTRODUCTION

HK based its suit on an indemnification provision included in a 1995 asset purchase agreement ("APA") between it and Eaton. The provision obligated Eaton to indemnify HK for any loss resulting from conduct of Eaton or Eaton-Kenway, an Eaton subsidiary. In 1998, a third party, Iowa Beef Producers, Inc. ("IBP"), sued HK. Ultimately HK settled the case for about $3 million, and it incurred about $6.6 million in fees and costs defending the suit. HK sought indemnification from Eaton for some portion of its loss, arguing that IBP's suit was based in part on Eaton-Kenway's conduct, and Eaton contested HK's indemnification claim.

---

[1]HK has also brought a motion for sanctions and a motion to file a surreply in opposition to Eaton's motion for judgment as a matter of law. I will deny HK's motion for sanctions and grant its motion to file a surreply without further discussion.

In the days leading up to the trial, I began to suspect that in my pretrial rulings I had incorrectly and/or inadequately interpreted the indemnification provision. During the trial these suspicions increased. I have since examined the parties' post-trial submissions and the trial record and re-examined the parties' earlier submissions, and my suspicion has become a conviction. I now conclude that I improperly interpreted the indemnification provision of the APA insofar as it relates to causation. I regret that the parties have had to spend time and money because of this error, but I am obliged to attempt to get the matter right. I am authorized to do so because pre-judgment decisions are subject to revision before the entry of final judgment. Fed. R. Civ. P. 54(b). And while I am reluctant to reopen issues once decided, I may do so where, as here, I incompletely and/or incorrectly resolved them. Agostini v. Felton, 521 U.S. 203, 236 (1997).[2] As I will discuss, I should have resolved most of the issues on summary judgment. However, several issues remain and at least one of them may require a new trial.

## II. BACKGROUND FACTS

In 1994, Eaton-Kenway responded to a request for a proposal from IBP to construct an automated material handling system ("AMHS") for IBP's beef processing plant in Dakota City, Nebraska. Eaton-Kenway was a "system integrator," i.e., an integrator of hardware and software for complex industrial systems. Eaton-Kenway partnered with Alvey Corporation ("Alvey") in responding to IBP's request. Under the Eaton-Kenway proposal, Alvey would create the conveyor system and Eaton-Kenway would design the software and integrate it with the conveyor system. In December 1994, IBP advised Eaton-Kenway that it had selected the Eaton-Kenway/Alvey bid, at a price not to exceed $14,300,000. The parties continued to

---

[2]I will discuss this point in more detail when I address the law of the case doctrine.

negotiate the design of the AMHS. IBP represented that it would only contract with Eaton-Kenway and Alvey if their system could meet a particular "throughput," a term describing a system's capacity to move boxes in a given period of time. IBP stated that the inbound throughput requirement was 3,816 cases per hour and the outbound 3,197 cases per hour. In a January 11, 1995 letter to IBP, an Eaton-Kenway agent represented that the AMHS would "meet or exceed" these throughput needs. (Compl. Ex. D at 2.)

While Eaton-Kenway and IBP negotiated, Harnischfeger, HK's predecessor and a competitor of Eaton-Kenway in the system integration business, negotiated with Eaton and Eaton-Kenway for the purchase of certain of Eaton-Kenway's assets. On January 12, 1995, these three companies entered into the APA pursuant to which Harnischfeger would purchase property from Eaton-Kenway as well as Eaton-Kenway's rights in connection with certain projects – including the IBP project. The APA contained the indemnification provision presently at issue. After signing the APA, Harnischfeger examined Eaton and Eaton-Kenway's financial records and reviewed the status of their ongoing projects. In February 1995, the companies closed the transaction. Subsequently, Harnischfeger changed its name to HK Systems, Inc.

HK took over Eaton-Kenway's negotiations with IBP. On March 23, 1995, HK entered into a contract with IBP for the construction of the AMHS under terms similar to those that Eaton-Kenway, Alvey and IBP had contemplated but not finalized. However, there were notable differences. The contract specified throughput numbers very similar to those that Eaton and IBP had contemplated, but stated that they were a "maximum." In addition, the HK/IBP contract changed the relationship between HK, Alvey and IBP. Whereas IBP had previously planned to enter into contracts with both Eaton-Kenway and Alvey, at HK's request, IBP agreed to contract with HK for the complete system and allow HK to subcontract with

3

Alvey for the conveyor portion of the system. HK and Alvey then went about manufacturing and installing the AMHS for the Dakota City plant. Throughout the process, HK worked with IBP to alter and refine the design specifications of the system.

HK and Alvey failed to meet deadlines and throughput expectations. HK and IBP tried to work out their problems, but ultimately the relationship broke down. IBP then contracted with a third party to bring the system up to its specifications and sued HK in Nebraska.[3] IBP asserted seven claims: (1) breach of the March 23, 1995 contract; (2) breach of express warranty; (3) breach of implied warranty of fitness; (4) breach of implied warranty of merchantability; (5) negligent misrepresentation; (6) fraud in the inducement; and (7) violation of the Nebraska Deceptive Trade Practices Act ("DTPA"). HK brought four counterclaims, including a claim for $128,148.39 in unpaid receipts. HK viewed some of IBP's claims as related to Eaton-Kenway's pre-contractual statements regarding throughput and requested Eaton's assistance in defending the suit. Eaton declined HK's request.

During the course of the IBP litigation, HK successfully moved for summary judgment on the fraud-in-the-inducement claim and successfully moved to exclude evidence that the contract called for anything other than a maximum throughput rate. As discussed, HK and IBP ultimately settled the remaining claims and counterclaims, and after Eaton declined HK's request for indemnification, HK commenced the present action.

### III. PROCEDURAL HISTORY

#### A. Pre-Trial Motions

In December 2002, Eaton filed a motion to dismiss, arguing that IBP's claims against HK arose out of HK's conduct rather than its own and accordingly did not trigger a duty to

---

[3]HK removed the case to federal court. I will hereinafter refer to such court as the "Nebraska court."

4

indemnify. HK responded that while certain of IBP's claims looked to its conduct, others looked in part to Eaton-Kenway's conduct and that it needed discovery to determine which claims fell into the latter category. In May 2003, I denied Eaton's motion. Later in 2003, on HK's motion, I attempted to construe APA Article 10.1, the indemnification provision. After determining that Wisconsin law governed the APA, I stated that Article 3, in which HK agreed to assume Eaton-Kenway's pre-closing liabilities related to the projects being sold, appeared to contradict Article 10.1, and to the extent that it did, Article 10.1 was ambiguous.

In 2005, the parties filed dispositive motions. Eaton moved for summary judgment, arguing that it had no obligation to indemnify HK for losses arising out of any of IBP's claims. Eaton contended that it could not be held responsible for IBP's contract-based claims because Eaton-Kenway had not contracted with IBP. It also argued that judicial estoppel precluded HK from asserting that Eaton-Kenway's statements to IBP constituted fraud in the inducement. Finally, Eaton argued that the Nebraska DTPA authorized only prospective injunctive relief and therefore could not implicate Eaton-Kenway's actions. HK filed a motion for partial summary judgment, arguing that some portion of IBP's case related to Eaton-Kenway's conduct and asking for a trial on damages.

In my February 9, 2006 summary judgment decision, I resolved the ambiguity identified in my 2003 decision and found that Article 10.1 applied to HK's claim against Eaton. I further found that Article 10.1 did not limit Eaton's indemnification obligation to claims arising out of a contract and that judicial estoppel was inapplicable. I then granted HK's motion for partial summary judgment, stating that except for the negligent misrepresentation claim (which involved HK's statements to IBP regarding the AMHS completion date), IBP's claims resulted at least in part from Eaton-Kenway's conduct. I based this conclusion on the fact that the IBP complaint mentioned Eaton-Kenway's statements, that IBP had attempted (generally

5

unsuccessfully) to present such statements to the Nebraska court, and that HK had presented evidence that Eaton contributed to the design of the AMHS prior to selling the project to HK.

Eaton filed a motion for reconsideration, and on May 24, 2006, I reversed my grant of partial summary judgment and modified the decision. I clarified that Eaton only had to indemnify HK to the extent that HK suffered losses covered by Article 10.1. I then discussed Article 10.1's causation element, as Eaton's motion for reconsideration emphasized that HK had failed to present evidence that Eaton caused its losses. However, I found that the APA's indemnification provision was broad, that a jury could infer that Eaton-Kenway's conduct caused HK's losses and that a trial was required.

**B.    Trial**

On September 11, 2006, the case went to trial. At the close of HK's case in chief, both parties moved for judgment as a matter of law, and I reserved decision on the motions. At the close of Eaton's case, the parties renewed their motions, and I again reserved decision.[4] The jury then awarded HK $3,128,148.39, which represented the total amount that HK paid to IBP along with the unpaid receipts that HK forgave IBP, in settlement of IBP's claims.

---

[4]In reserving decision, I cited the following language from the Commentary to Federal Rule of Civil Procedure 50:

> [o]ften it appears to the court . . . that a motion for judgment as a matter of law made at the close of the evidence should be reserved for a post-verdict decision. This is so because a jury verdict for the moving party moots the issue and because a preverdict ruling gambles that a reversal may result in a new trial that might have been avoided. For these reasons, the court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of evidence.

6

## IV. INDEMNIFICATION PROVISION

### A.    Previous Discussion of Causation

HK has always contended that some portion of its IBP litigation losses resulted from Eaton-Kenway's pre-closing statements to IBP that it would meet IBP's throughput requirements. HK has further contended that "resulting from" is synonymous with "arising out of" and that Article 10.1 required Eaton to indemnify it for loss due to any claim of IBP's that would not or could not have been brought "but for" Eaton-Kenway's statements. (Pl.'s Br. in Opp'n to Mot. to Dismiss at 17.) In the early stages of the case, HK appeared to concede that IBP's breach of contract, negligent misrepresentation, and breach of implied warranty of merchantability claims did not result from Eaton-Kenway's conduct. (See Pl.'s Br. in Supp. of Mot. for Order Construing Asset Purchase Agreement at 1; see also Pl.'s Br. in Opp'n of Mot. to Dismiss at 21.) Citing to IBP's references to Eaton-Kenway's statements in its complaint, HK argued that only IBP's remaining claims resulted, in part, from Eaton-Kenway's conduct. (See Pl.'s Br. in Supp. of Mot. for Order Construing Asset Purchase Agreement at 1.) In summary judgment briefing, HK did not analyze each IBP claim individually but more generally argued that some portion of its losses resulted from Eaton-Kenway's statements. (See generally Pl.'s Br. & Proposed Findings of Fact in Supp. of Mot. for Partial Summ. J.) Eaton countered that no IBP claim could be said to have resulted from Eaton-Kenway's conduct unless such conduct and not HK's conduct provided the basis for the claim.

In the February 9, 2006 summary judgment decision, I stated that with the exception of IBP's negligent misrepresentation claim, each of IBP's claims was "based at least in part on" Eaton's conduct and noted IBP's attempt to admit in evidence Eaton-Kenway's pre-closing statements. (Feb. 9, 2006 Decision & Order at 7.) Unfortunately, in this perfunctory discussion, I failed to illuminate the meaning of "resulting from." In the May 24, 2006 decision

7

on Eaton's motion for reconsideration, I discussed causation in greater detail, stating that the indemnification provision:

> requires Eaton to indemnify HK for losses wholly or partially "resulting from" Eaton's acts or omissions. The phrase, "resulting from," is synonymous with "arising out of," see Lee R. Russ & Thomas F. Segalia, 7 Couch on Insurance 3d § 101:54 (3d ed. 2005) (collecting cases), and "arising out of" means "originating from, growing out of, or flowing from, and requir[es] only that there be some causal relationship between the injury and the risk for which coverage is provided." Lawver v. Boling, 71 Wis. 2d 408, 415 (1976). Thus, to prevail on its indemnification claim, HK must establish that Eaton's conduct wholly or partially caused its losses.

(May 24, 2006 Decision & Order at 6-7.) Based on this broad reading, I stated that HK could prove that its losses resulted from Eaton-Kenway's pre-contractual statements to IBP by satisfying a jury that IBP's claims were supported by such statements, that "the primary reason that IBP was dissatisfied with the AMHS" was that the system had failed to live up to Eaton-Kenway's promises and that Eaton-Kenway had "designed critical components of the system" before HK bought the right to build such system (Id. at 7.) The May 24 decision did not explicitly accept HK's argument in favor of "but for" causation, but the decision adopted a meaning of causation at least as broad.

## B. Present Interpretation of "Resulting From"

Some first principles of contract interpretation are in order. Interpretation of a contract is a question of law for the court. Yauger v. Skiing Enters., Inc., 206 Wis. 2d 76, 80 (1996). The aim of contract interpretation is to ascertain the intent of the parties. DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship, 273 Wis. 2d 577, 597 (2004). Courts must attempt to interpret contracts to give reasonable meaning to each provision without rendering any superfluous. Id. They must also avoid any interpretation of a contract that could lead to an absurd result. Kabes v. Sch. Dist., 270 Wis. 2d 502, 510 (Ct. App. 2004).

8

A contract must be construed as a whole.  <u>Pleasure Time v. Kuss</u>, 78 Wis. 2d 373, 379 (1977).

Specific rules govern the interpretation of indemnification agreements.  A party may agree to indemnify another against liability for its own conduct and the indemnitee's conduct. <u>Barrons v. J.H. Findorff & Sons</u>, 89 Wis. 2d 444, 452 (1979).  Insofar as an indemnitor agrees to cover legal claims based on its own acts, an indemnification agreement should be construed broadly, but insofar as the agreement requires indemnification for the indemnitee's acts, it should be construed strictly.  <u>Id.</u>  In the absence of clear and unequivocal language, an indemnification agreement should not be construed to require indemnification for conditions or operations not under the control of the indemnitor.  <u>Hortman v. Otis Erecting Co.</u>, 108 Wis. 2d 456, 464 (Ct. App. 1982).

Article 10 of the APA controls indemnification between HK and Eaton, and contains two relevant sections.  Article 10.1 specifies when Eaton must indemnify HK, and Article 10.2 specifies when HK must indemnify Eaton.  The sections read as follows:

> 10.1   <u>Indemnification of the Buyer</u>. Each of [Eaton-Kenway] and Eaton, jointly and severally shall indemnify [HK][5] and its officers, directors and shareholders (collectively, the "Buyer Indemnified Parties") and hold each of the Buyer Indemnified Parties harmless from and against any and all damages, losses, deficiencies, actions, demands, judgments, costs and expenses (including attorneys' and accountants' fees) of or against any of the Buyer Indemnified Parties resulting from (i) any misrepresentation or breach of warranty hereunder on the part of [Eaton-Kenway] or Eaton, (ii) any nonfulfillment of any agreement or covenant contained herein . . . on the part of [Eaton-Kenway] or Eaton . . . and (iii) any act or omission of [Eaton-Kenway] or Eaton or any occurrence of a matter with respect to the Subject Assets or the Subject Business relating to or arising out of the period on or before the Closing Date, including without limitation, any claim related to any work performed by [Eaton-Kenway] under the Coke Agreement or any of the other Projects, any other claim for nonperformance or breach of contract, any claim for worker's

---

[5]I have substituted "HK" for "Seller" in this block quote, though HK was still called Harnischfeger at the date of contract.

compensation or unemployment compensation, and/or any claim for personal injury or property damage.

10.2 <u>Indemnification of the Seller</u>. [HK] shall indemnify [Eaton-Kenway] and Eaton and their respective officers and directors (collectively, the "Seller Indemnified Parties") and hold each of the Seller Indemnified Parties harmless from and against any and all damages, losses, deficiencies, actions, demands, judgments, costs and expenses (including attorneys' and accountants' fees) of or against any of the Seller Indemnified Parties resulting from (i) any misrepresentation or breach of warranty hereunder on the part of [HK], (ii) any nonfulfillment of any agreement or covenant contained herein . . . on the part of [HK], and (iii) any act or omission of [HK] or any occurrence of a matter with respect to the Subject Assets or the Subject Business relating to or arising out of the period after the Closing Date, including without limitation, any claim for nonperformance or breach of contract, any claim for worker's compensation or unemployment compensation, and/or any claim for personal injury or property damage.

(Compl. Ex. E at 57.)

Articles 10.1 and 10.2 define those situations in which each party to the APA is required to indemnify the other. Read together, the articles are an attempt to create a workable system for determining which entity would be responsible for expenses arising out of legal claims regarding the assets Eaton-Kenway transferred to HK.[6] In both articles, subsections (i) and (ii) govern legal claims between HK and Eaton or Eaton-Kenway arising out of the APA, and subsection (iii) governs claims against HK, Eaton or Eaton-Kenway brought by third parties.[7] Article 10.1(iii) provides that Eaton will indemnify HK for any loss

_____

[6]As discussed, I previously stated that Article 10.1 was ambiguous to the extent that Article 3 seemed to contradict it, (Dec. 17, 2003 Mem. at 7), and in the summary judgment decision, I addressed the contradiction. (Feb. 6, 2006 Decision & Order at 6). I have never found Article 10.1 to be ambiguous in itself.

[7]Subsection (iii) does not explicitly refer to "third-party legal claims," but the examples it gives as to how a pre-closing act, omission or occurrence could lead to a loss are all third-party legal claims. <u>See</u> <u>United States v. Sec. Mgmt. Co.</u>, 96 F.3d 260, 265 (7th Cir. 1996) (stating that under Wisconsin's ejusdem generis rule, "where a general term . . . is preceded or followed by a series of specific terms, the general term is viewed as being limited to items of the same type or nature as those specifically enumerated").

10

regarding the assets sold resulting from (a) any pre-closing act of Eaton; (b) any pre-closing omission of Eaton; or (c) any pre-closing occurrence. Article 10.2 provides that HK will indemnify Eaton for any loss regarding the assets sold resulting from: (a) any post-closing act of HK; (b) any post-closing omission of HK; or (c) any post-closing occurrence.

I previously stated that Article 10.2 "has no bearing on Eaton's obligation to indemnify HK for losses resulting from Eaton's own pre-closing conduct." (Dec. 17, 2003 Decision & Order.) This is literally true; Article 10.2 covers situations in which Eaton is entitled to indemnification by HK. Nevertheless, in determining the meaning of the causation language, Article 10.2 is helpful. Because Articles 10.1 and 10.2 are mirror provisions, "resulting from" must have the same meaning in each provision. And if, as HK contended and in substance I previously found, one party's loss must be indemnified if it would not have occurred "but for" some action of the other, no matter how remote the action from the loss and no matter what intervening events occurred, Articles 10.1 and 10.2 would swallow one another and lead to absurd results. Each indemnification provision would be so inclusive that the parties would have to indemnify each other for virtually any loss arising from a claim relating to any asset transferred by Eaton to HK. The following examples illustrate this.

First, imagine that just prior to Eaton-Kenway's transfer of property to HK, an Eaton-Kenway employee spilled some oil on a workroom floor. Imagine further that after the purchase, HK employees noticed the spill but failed to clean it up. A month later, a third party slipped and fell on the spill, injuring himself. As I previously defined causation, if the third party sued HK for negligence, HK could likely require Eaton to indemnify it for its entire loss under Article 10.1. This is so because Eaton-Kenway originally spilled the oil and but for such act, the third party would not have sued HK. And if the third party sued Eaton-Kenway, Eaton-Kenway could likely require HK to indemnify it for its entire loss under Article 10.2

11

because the third party would not have sued Eaton-Kenway but for the fact that HK negligently ignored the spill.

Second, imagine that just prior to Eaton-Kenway's transfer of assets to HK, Eaton-Kenway hired a new employee, and immediately after the transfer, HK fired her. If the employee sued HK for wrongful termination, HK could likely require Eaton to indemnify it for its entire loss under Article 10.1 because but for Eaton's hiring the employee, HK would not have been sued. And if the terminated employee sued Eaton-Kenway, Eaton-Kenway could likely require HK to indemnify it under Article 10.2 because but for HK's firing, Eaton-Kenway would not have been sued.

Finally, imagine that just prior to Eaton-Kenway's transfer of assets to HK, Eaton-Kenway contracted with a third party to build an AMHS, and after the transfer, HK performed the work required by the contract. Further, imagine that the third party was dissatisfied with HK's work and sued HK. HK could likely require Eaton to fully indemnify it under Article 10.1 because the third party would not have brought the action but for the fact that it contracted with Eaton-Kenway. However, if the third party sued Eaton-Kenway, Eaton-Kenway could likely obtain full indemnification from HK because but for HK's unsatisfactory work, Eaton-Kenway would not have been sued.

Each of the above hypotheticals are conceivable under my previous interpretation of "resulting from." And the result of each is absurd, as it would make no sense for both parties to a contract to each agree to indemnify the other for the same losses. Rather than providing a workable system for determining responsibility to pay legal expenses, the contract would lead to confusion and endless litigation. Thus, my previous definition of causation was clearly wrong. See Kabes, 270 Wis. 2d at 510 (stating that courts should avoid interpretations of contracts that lead to absurd results).

In determining how a loss could be said to result from an act or omission of Eaton or Eaton-Kenway in connection with a third-party legal claim, I made two clear errors. First, I incorrectly analyzed how directly the act or omission must relate to the claim. And second, I incorrectly analyzed how the merits of the claim affects whether the loss arising from the claim resulted from the act or omission.

As to the directness issue, in order to harmonize Article 10.1 with Article 10.2, I now read Article 10.1(iii) as requiring Eaton to indemnify HK only where Eaton or Eaton-Kenway's act or omission (or a pre-closing occurrence) directly gives rise to a claim against HK. This is not to say that the claim must have fully accrued during Eaton's tenure. In contrast to Article 3, Article 10 does not refer to accrual. Thus, if Eaton-Kenway breached a contract prior to the closing date, a breach of contract action claiming consequential damages would be based on Eaton-Kenway's act even if the claimant did not incur damages until after the closing date. However, under Article 10.1, the claim must be based on Eaton-Kenway's act or omission or on a pre-closing occurrence.

Thus, if a significant intervening and superceding event separated the act, omission or occurrence from the claim, a loss ensuing from the claim could not be fairly said to result from the claim. This common sense notion not only reflects the language and structure of the agreement but is consistent with contract law, Smith v. Katz, 226 Wis. 2d 798, 824 (1999) (stating that there is no causal nexus between an early "cause" and an injury for the purpose of an indemnification contract where the "cause [has been] interrupted or replaced by another cause"); with tort law, Fandrey v. Am. Family Mut. Ins. Co., 2004 WI 62, ¶ 15 n.12 (2004) (discussing the effect of remoteness of an allegedly negligent act from an injury), and even with criminal law, State v. Ellefson, No. 84-2472, 1986 Wisc. App. LEXIS, at *8-17 (Wis. Ct.

App. Feb. 20, 1986) (explaining the intervening cause defense to a drunk driving charge).[8] Thus, while the hypothetical breach of contract action described above certainly would never have been brought but for Eaton-Kenway's having entered into a contract, HK's conduct allegedly breaching the contract would constitute an intervening and superceding cause. See Scottsdale Ins. Co. v. Subscription Plus, Inc., 299 F.3d 618, 621 (7th Cir. 2002) (discussing Wisconsin law regarding superceding events and citing Leposki v. Ry. Express Agency, Inc., 297 F.2d 849, 849-51 (3d Cir. 1962) for the proposition that where a person spills gasoline, and a second person drops a match on such gasoline, the dropping of the match breaks the causal chain between the spill and the resulting fire).

Of course, this is not to say that a loss cannot have two independent causes – one being Eaton-Kenway's conduct and the other being HK's conduct – leading to an obligation of Eaton to cover that portion of the loss caused by its own conduct. For example, if a plaintiff sued HK for fraud and claimed that Eaton-Kenway made a fraudulent misrepresentation prior to transferring its assets to HK, and HK made another fraudulent misrepresentation after the transfer, HK could obtain indemnification for that portion of its loss caused by Eaton-Kenway's fraud but not for the remaining portion. But there is a critical difference between a duty to indemnify for a portion of a loss produced by several causes and a duty to indemnify for a loss separated from Eaton-Kenway's conduct by a significant superceding event. See 7 Couch on Insurance 3d § 101:47 (2005).

---

[8]I rely on the cited cases only insofar as they help me understand the parties' intent. In part, my earlier missteps resulted from placing too much weight on the definition of "resulting from" in certain insurance cases, rather than focusing on the definition contemplated by HK, Eaton and Eaton-Kenway when they entered the contract. (See May 24, 2006 Decision & Order at 6-7 (citing Lawver v. Boling, 71 Wis. 2d 408 (1975)).)

So interpreted, Articles 10.1 and 10.2 compliment rather than contradict one another, as any particular claim in a lawsuit will be based either on Eaton-Kenway's act or omission, or a pre-closing occurrence, or on HK's act or omission, or a post-closing occurrence.[9] Further, interpreted in this way, the indemnification provisions are consistent with Wisconsin causation law, see Smith, 226 Wis. 2d at 824, and with the legal principal that in the absence of clear language, an indemnitor should not have to provide indemnification for a loss over which the indemnitor had no control. See Hortman, 108 Wis. 2d at 464. Further, this interpretation leads to a reasonable result. Under HK's "but for" causation, Eaton would have to indemnify HK for virtually any claim related to a transferred asset, given that Eaton-Kenway initiated all of the project assets and thus necessarily engaged in conduct constituting a link in the causal chain leading to any loss. It is highly implausible that sophisticated corporations like HK and Eaton would agree to such indemnification. See id. (stating that "if we were to adhere to the trial court's broad construction of the indemnification agreement, the subcontractor's liability would be almost limitless"). Rather, HK, Eaton and Eaton-Kenway agreed that the party actually responsible for the creation of a third-party claim (and thus the party able to prevent such claim from materializing) is responsible for covering losses arising out of such claim.

I now turn to the effect of the merits of a third-party claim on Eaton's duty to indemnify. I addressed this issue in the February 9 and May 24, 2006 decisions but, again, incompletely

---

[9]Eaton-Kenway and HK did not work on any project at the same time.

and unclearly.[10]  In the absence of contract language to the contrary, an indemnification agreement covering losses arising from third-party claims based on the indemnitor's conduct is presumed to apply only when the indemnitee is actually liable for the claim.  Carey Transportation, Inc. v. The Greyhound Corporation, 80 B.R. 646, 652 (S.D.N.Y. 1987); see also Barrons, 89 Wis. 2d at 455-56 (noting that when an indemnitee seeks reimbursement related to a third-party claim that it settled after giving the indemnitor the opportunity to participate in the defense, the indemnitee is relieved of proving that it was actually liable to the third party and most only establish that it was potentially liable.).

There are exceptions to this general rule.  Where an indemnitor agrees to assume a duty to defend (such as with insurance contracts), then such duty applies to any allegation that could arguably give rise to covered liability, even if the allegation is meritless or frivolous.  Carey Transp., 80 B.R. at 652.  In addition, even where an indemnitor does not assume a duty to defend, special rules apply when an indemnitee settles a third-party claim.  If the indemnification agreement covers the settled claim, the settlement is reasonable, and the indemnitee gives the indemnitor reasonable notice of the claim and an opportunity to participate in defending or settling it, the indemnitee is entitled to indemnification of the settlement amount as long as it was potentially liable for the claim.  Deminsky v. Arlington Plastics Mach., 259 Wis. 2d 587, 619 (2003); see also Carey Transp., 80 B.R. at 652; Barrons, 89 Wis. 2d at 455-56 (following Parfait v. Jahncke Service, 484 F.2d 296 (5th Cir.

---

[10]In the February 9 decision, I noted that to obtain indemnification, an indemnitee who settles a claim generally must establish actual liability, but that if before settling, it gave the indemnitor notice of the claim and the indemnitor refused to defend, it need only show potential liability.  I found that HK gave Eaton such notice and thus had to establish only potential liability. (Feb. 9, 2006 Decision & Order at 8-10.)  In the May 24 decision, I did not revisit the issue but stated that because causation had yet to be determined, the potential liability standard had no application.  (May 24, 2006 Decision & Order at 5 n.3.)

16

1973) and <u>Morrissette v. Sears, Roebuck & Co.</u>, 322 A.2d 7 (N.H. 1974)); 41 <u>Am. Jur. 2d</u> <u>Indemnity</u> § 27 (2005). The rationale underlying this principle is to encourage reasonable settlements but at the same time to protect the indemnitor's right to due process and to prevent an indemnitee from subjecting an indemnitor to a wholly voluntary expenditure. <u>Parfait</u>, 484 F.2d at 304-05; <u>Morrissette</u>, 322 A.2d at 10-11.

In the present case, the parties have argued that in Article 10 they intended something different from the principles stated above, but they disagree radically as to what they intended. HK argued that Article 10.1 obligates Eaton to indemnify HK for losses based on any third-party claim that alleges liability, regardless of whether HK was actually or potentially or even conceivably liable for such claim. (March 17, 2006 Br. in Opp'n at 4-5.) HK based this argument on the requirement in Article 10.1 that Eaton indemnify HK against "any and all damages, losses, deficiencies, <u>actions</u>, demands, judgments, costs and expenses." (<u>Id.</u> at 5 (citing Compl. Ex. E at 57) (emphasis added by HK).) However, the quoted language is merely an attempt to identify the situations in which HK might lose money and thus be entitled to seek indemnification. It has nothing to do with the issue of actual versus potential liability.[11] Eaton argued that it need not indemnify a settled claim unless HK was actually liable for the claim regardless of whether HK sought its help in defending the claim. It based this argument on the language in Article 10.3 authorizing the indemnitee to enforce the agreement "once the amount of the claim is finally determined." (Feb. 24, 2006 Br. in Supp. at 8-9.) However, such language does not address actual versus potential liability. It refers only to what must occur before a party brings a suit for indemnification at all – a third-party claim must be resolved. And the surrounding language appears to clarify that the contract does not intend

---

[11]The real issue is not whether HK was involved in an action, but how an action could be said to result from Eaton's conduct, i.e., whether such conduct must create liability.

17

Case 2:02-cv-01103-LA   Filed 06/18/07   Page 17 of 23   Document 383

to contradict the applicable law on this issue. (See Compl. Ex. E at 58-59 (referring to the right of the indemnitee to settle and to "pursue each and every remedy available to it at law.")

Thus, I conclude the parties intended that Article 10.1 reflect the principles of contractual indemnification discussed above. These principles make sense. The requirement that the indemnitee establish actual liability for a non-settled claim protects the indemnitor from having to indemnify a totally non-meritorious claim that resulted from a third party's legal miscalculation rather than the indemnitor's conduct. And, as discussed, in the case of a settlement of a claim of which the indemnitor has had notice and an opportunity to participate, the potential liability rule encourages settlements and provides due process for the indemnitor.

## V. APPLICATION OF INDEMNIFICATION PROVISION TO HK'S LOSS

In my February 9 and May 24, 2006, decisions, I found that a reasonable jury could conclude that Eaton-Kenway and HK had each caused HK's loss and that a jury trial was required to allocate their respective responsibilities. In light of my reinterpretation of Article 10.1, I must reconsider that conclusion and examine each of IBP's claims against HK.

First, I conclude that no reasonable jury could find that IBP's breach of contract and breach of express and implied warranty claims resulted from Eaton-Kenway's conduct. IBP's complaint makes clear that the breach of contract claim is based on the March 23, 1995 contract between IBP and HK. (Compl. Ex. F at 2-4.) With respect to the breach of warranty claims, IBP's allegations, Nebraska law, the decisions of the Nebraska court and the fact that the March 23 contract was an integrated one make clear that such claims also arose solely from the March 23 contract. IBP's allegations indicate that the warranty claim arose from a contract. Further, under Nebraska law, breach of warranty claims necessarily arise from a contract. See Neb. Rev. Stat. § 2-313 (regarding express warranty); Neb. Rev. Stat. § 2-314

18

(regarding implied warranty of merchantability); Neb. Rev. Stat. § 2-315 (regarding implied warranty of fitness for a particular purpose). The decision of the Nebraska court also indicates that the warranty claims arose from a contract. (Oct. 20, 2005 Banerji Decl. Ex. 80 (Neb. Court Decision) at 7-8.) Finally, the March 23 contract between IBP and HK was an integrated one, i.e., it contained the total agreement between HK and IBP. (Def.'s Statement of Uncontested Facts Ex. 63 (March 23 Contract) at 1 (stating that it contract "shall be the entire agreement between the parties); (Oct. 20, 2005 Banerji Decl. Ex. 80 (Neb. Court Decision) at 7-8 (stating that the March 23 agreement was an integrated contract)). See also Black's Law Dictionary 812 (7th ed. 1999) (defining "integrated contract"). As such, each of IBP's warranty claims looked to the March 23 contract and not to any earlier agreements.

The fact that IBP unsuccessfully attempted to introduce evidence of Eaton-Kenway's pre-contractual statements, (see Oct. 20, 2005 Banerji Decl. Ex. 80 (Neb. Court Decision) at 7-8), does not change the fact that the claims were based on the March 23 contract. Moreover, as discussed, although HK would not have entered into the March 23 contract but for Eaton-Kenway's pre-contractual negotiations with IBP, these negotiations cannot reasonably be said to have caused IBP's breach of contract or breach of warranty claims. The integrated contract between HK and IBP and HK's partial performance of the contract broke any causal link between any act or omission of Eaton-Kenway, or any pre-closing occurrence, and IBP's contract and warranty claims. See Katz, 226 Wis. 2d at 824.

HK has never contended that IBP's negligent misrepresentation claim resulted from Eaton-Kenway's conduct, and it clearly did not.

IBP's fraud in the inducement claim alleged liability based on Eaton-Kenway's conduct. IBP alleged that Eaton-Kenway misrepresented that the AMHS could "meet or exceed" IBP's expectations, although it knew such statement to be false. (Compl. Ex. F at 17.)

Nevertheless, HK is not entitled to indemnification for costs associated with it because the Nebraska court found that HK was not actually (or potentially) liable for such claim and dismissed it.[12] HK has previously suggested that the Nebraska court's dismissal of this claim could have been overturned on appeal, but it has never actually argued that the Nebraska court's decision was wrong and my review of the decision indicates that it was correct. Thus, it is clear that HK was not liable for such claim and Eaton is not obliged to provide indemnification for costs associated with it.

Finally, I turn to IBP's DTPA claim. IBP based this claim on Nebraska's version of the Uniform DTPA, the purpose of which is to deal with "conduct involving either misleading trade identification or false or deceptive advertising." Indus. Specialty Chems. v. Cummins Engine Co., 902 F. Supp. 805, 812 (N.D. Ill. 1995) (internal quote marks omitted). The Nebraska statute prohibits fourteen deceptive sales practices, including representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," or "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Neb. Rev. Stat. § 87-302(a)(5) & (7). The statute authorizes persons aggrieved by a prohibited practice to enjoin the seller from continuing to engage in the deceptive practice and in exceptional circumstances to recover attorneys' fees. Neb. Rev. Stat. § 87-303. Further, if the plaintiff establishes that the seller induced it to purchase goods by means of a prohibited practice, any resulting contract is unenforceable and the buyer may retain the goods and refuse to pay for them. Neb. Rev. Stat. § 87-303.07.

---

[12]The APA did not create any express duty to defend based on the allegations of a third-party complaint.

In its suit against HK, IBP alleged that HK represented that the AMHS would have "characteristics, uses, and benefits" that it did not have, i.e., reliability, functionality and throughput, and that Eaton-Kenway and/or HK represented that the AMHS would be of "a particular quality and standard," as to its reliability, functionality and throughput. Further, IBP incorporated into the claim all of the pre-contractual and post-contractual statements that it identified elsewhere in the complaint, including some statements made by Eaton-Kenway and others made by HK.[13] (Compl. Ex. F at 19). And the Nebraska court does not appear to have barred the admission of evidence of Eaton-Kenway's pre-contractual statements as to the DTPA claim. (See Oct. 20, 2005 Banerji Decl. Ex. 80 (Nebraska Court Decision) at 7-9.) As such, some of IBP's alleged DTPA violations looked to Eaton-Kenway's conduct and were live at the time of settlement.

In order to prove an entitlement to indemnification for some loss related to the DTPA claim, HK must make a coverage showing and a liability showing. As to coverage, HK must show that some portion of the settlement looked to that portion of the DTPA claim that arose directly from Eaton-Kenway's conduct. As to liability, HK must show that it faced potential liability for that portion of the DTPA claim that arose directly from Eaton-Kenway's conduct. Although the parties have disputed whether HK "tendered" the defense of the case to Eaton in the sense that it offered to turn over complete control of the case to Eaton, it is clear that

---

[13]IBP's complaint alleged numerous misrepresentations by HK: that the AMHS would provide a particular throughput; that HK "was capable and experienced in beef handling and that its system was the best designed system for use in the plant"; that HK would meet IBP's specifications; that HK would deliver the system on time; that the AMHS would operate and perform consistently; that the system was fit for IBP's particular use; and that HK's repair methods and procedures and design modifications would remedy all of the problems and defects in the AMHS. (Compl., Docket #1, Ex. F.) IBP's complaint also alleged several misrepresentations by Eaton-Kenway, e.g., that Eaton-Kenway would "meet or exceed" IBP's throughput requirement; that the AMHS would be completed on time; and that Eaton-Kenway and Alvey were leaders in the material handling industry and were dependable. (Id.)

HK gave Eaton notice of the IBP suit and of its view that some portion of the suit was indemnifiable and that Eaton had some opportunity to participate in the case. (See Feb. 24, 2006 Banerji Decl. Ex. 4 (Letter from Thomas L Stricker, Jr.).) Further, it is undisputed that Eaton unequivocally declined to participate in the case. (See Feb. 24, 2006 Banerji Decl. Ex. 5 (Letter from Michael A. Stiegal).) Thus, Eaton had "ample opportunity" to protect its interests but chose not to. See Deminsky, 259 Wis. 2d at 618. Finally, HK must establish that its settlement was reasonable.

## VI. LAW OF THE CASE

Under the law of the case doctrine, my previous interpretation of Article 10.1 and my application of it to the facts of the present case are presumed correct. Avitia v. Metro. Club of Chi., 49 F.3d 1219, 1227 (7th Cir. 1995). However, the presumption "is not a straightjacket." Id.; see also Castro v. United States, 540 U.S. 375, 384 (2003) (stating that the law of the case doctrine does not limit judicial power). Ultimately, the doctrine "is a discretionary" one. Bagola v. Kindt, 131 F.3d 632, 637 (7th Cir. 1997). A court may revisit its own earlier ruling if it has a strong and reasonable conviction that the ruling was wrong and if rescinding it would not unduly harm the party that benefitted from it. Avitia, 49 F.3d at 1227.

As discussed above, I conclude that my previous interpretation of Article 10.1 was wrong, and that as a result, my summary judgment decision was wrong. The question of whether the party benefitting from the decision will suffer harm does not look to whether the substance of the decision will cause harm; it obviously will, given that the party will lose the benefit of an erroneous decision. Rather, it looks to whether the party received notice that the court was considering a reversal, Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1339 (7th Cir. 1997), and had the opportunity to prepare for it, Prisco v. A&D Carting Corp., 168 F.3d 593, 607 (2d Cir. 1999). In the present case, I notified the parties on June 15, 2007 of

22

my intention to reverse myself.  Moreover, I will give the parties the opportunity to resolve the remaining issues and to submit their views on the best way to resolve such issues.  Thus, this decision creates no "undue harm" problem.  <u>See</u> <u>Avitia</u>, 49 F.3d at 1227.

## VII.  CONCLUSION

Therefore,

**IT IS ORDERED** that plaintiff's motion for sanctions is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs motion for leave to file a surreply brief is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant's motion for reconsideration of my February 6, 2006, summary judgment decision is **GRANTED**.

**IT IS FURTHER ORDERED** that the jury's verdict is **VACATED**.

**IT IS FURTHER ORDERED** that defendant's motion for judgment as a matter of law is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that a telephonic status conference is scheduled for **August 2, 2007 at 2:30 p.m.** to discuss how to proceed.  The court will initiate the call.

**FINALLY, IT IS ORDERED** that the parties shall notify the court within one week of the status conference which attorneys of record will appear on the call.

Dated at Milwaukee, Wisconsin, this 18 day of June, 2007.


/s_____
LYNN ADELMAN
District Judge